UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


UNITED STATES OF AMERICA        *    Docket 07-CR-425-J
                                *
versus                          *    New Orleans, Louisiana
                                *
BYRON NEAL                      *    October 27, 2011
* * * * * * * * * * * * * * * * *


SENTENCING BEFORE THE
HONORABLE CARL J. BARBIER
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          U.S. Attorney's Office
                             500 Poydras Street
                             Room HB-210
                             New Orleans, Louisiana 70130


For the Defendant:           John-Michael Lawrence
                             Attorney at Law
                             Energy Center
                             1100 Poydras Street
                             Suite 2900
                             New Orleans, Louisiana  70163-2900


Official Court Reporter:     Jodi Simcox, RMR, FCRR
                             500 Poydras Street
                             Room HB-406
                             New Orleans, Louisiana 70130
                             (504) 589-7780


Proceedings recorded by mechanical stenography, transcript

produced by computer.

**PROCEEDINGS**

**(October 27, 2011)**

**\*\*\*\*\*\***

**(COURT CALLED TO ORDER)**

THE DEPUTY CLERK:  All rise.

Criminal Action No. 07-425, *USA versus Byron Neal*.

MR. LAWRENCE:  John Michael Lawrence here on behalf of Mr. Neal, Your Honor, who is present before the Court out of the box.

MR. QUINLAN:  Jay Quinlan on behalf of the United States.

THE COURT:  All right.  Mr. Byron Neal, sir, you are the same person who's the defendant in this case?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  You're going to need to get yourself up to that microphone and just speak up loudly and clearly.  You don't have to bend over, but just speak up loudly and clearly so that we can hear you.  Okay?

THE DEFENDANT:  Yes, sir.

THE COURT:  Mr. Neal, have you received a copy of the written presentence report in your case?

MR. LAWRENCE:  Yes, Judge.  We went over it.  I sent it to Mrs. Neal, brought it to Mr. Neal.  We went over the sentencing memorandum, and there are no objections to the

report.

THE COURT:  Okay.

THE DEFENDANT:  Yes.

THE COURT:  All right.  Before we go any further with the sentencing, the Court, following -- subsequent to Mr. Neal's rearraignment, which occurred on July 18th, the Court received a handwritten letter from Mr. Neal, which I interpreted as a -- it's captioned, "To Take Plea of Guilty Back."  I'm not going to read the whole letter, but he says: "I'm writing you" -- addressed to me -- "I'm writing you requesting to take my plea back," and then he goes on to further state why he wants to take his plea back.

So the Court construed that as a motion to withdraw the guilty plea and set that for hearing this morning at the same time.

Mr. Neal or Mr. Lawrence, do either one of you want to say anything further in connection with that matter?

MR. LAWRENCE:  That would be up to Mr. Neal, Judge. I'm not --

THE COURT:  Mr. Neal, would you like to say anything further on that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  Go ahead and speak.

THE DEFENDANT:  I would like to withdraw my plea because I wasn't -- during trial, he was telling me he wasn't

going to represent me when I was preparing for trial.  And I had asked for people -- subpoena people, and they wasn't subpoenaed.

Then when it come down -- when it came down to the plea when they talked about it, he was saying about he wasn't going to oppose, or nothing wasn't going to come up in the -- I ain't see it, but I talked to Mr. Lawrence came to see me Monday, and the date Thursday, about the PS -- dealing with the PSI, and it ain't right.  He said he wasn't going to oppose it.  Now, everything in the PSI, how it's saying, it ain't right.

And then when I caught that it wasn't right, I didn't make the intelligent decision.  I was under pressure to make a decision.  I couldn't -- I couldn't think.  Then I was under the impression how it was, like, by they was saying about the ten years, five, if I would drop it, then the ten by them billing me.  Then by the -- maybe there was dealing with my mental -- I was under the impression, like, it might gonna be, like, down by the ten, and then it go down, like, by the mental.  Like, I was, basically, going to be, you know, time, because I been down four years or something.  That's how I looked at it.

But nobody -- now, one of them, they had -- they said that they didn't know about the -- what that was, the murder, nobody ain't go over the -- I ain't know nothing about

that.  Nobody know what it carried.  Somehow how they was saying it, so I didn't know it was way over.  Because when they're talking about plea deals, I would never take the plea. The plea deals and how it was, 20 years, all that there, I wouldn't take it.

Then when I got ready for trial, I was going to trial, and then my lawyer, what can I do if he said he wasn't going to represent me?

**THE COURT:**  All right.  Mr. Lawrence, would you like to say anything?

**MR. LAWRENCE:**  I disagree with the representations made.  Mr. Neal was -- it was explained to Mr. Neal that he was on tape in both charges.  There's video, there's undercover agents.  We discussed that thoroughly.  He kept saying that there should be some defenses; there weren't any.

He finally decided to take the plea agreement because, given the directives that came down from the government the week before, he was now facing ten to life instead of mandatory life.  So he made that decision to go on and plead because of that.

Mr. Neal rarely remembers anything from one conversation to the next, Judge.

**THE COURT:**  All right.  I have read Mr. Neal's letter, which, as I said, the Court construes as a motion to withdraw guilty plea.  That's record document 204.  Of course,

a defendant does not have the absolute right to withdraw his guilty plea.  To be allowed -- before the court can allow a defendant to withdraw his guilty plea, there must be a fair and just reason.  The defendant bears the burden of establishing that there is a fair and just reason for withdrawing his guilty plea.

Because, otherwise, permitting a defendant to withdraw his plea without good reason would simply -- could undermine any and all pleas and plea agreements.  The Fifth Circuit in *United States versus Grant*, 117 F.3d 788 set forth the factors that a court should consider:

One, whether the defendant has asserted his innocence;

Two, whether withdrawal would cause the government to suffer prejudice;

Third, whether the defendant delayed filing the motion;

Four, whether withdrawal would substantially inconvenience the court;

Five, whether there was close assistance of counsel available;

Six, whether the original plea was knowing and voluntary;

And seven, whether the withdrawal would waste judicial resources.

The Court has considered all of these factors in connection -- first of all, it seems to me that Mr. Neal has never really asserted his innocence.  He did indicate in his letter that he wanted to go to trial to show that he was a good person, or something like that, or he was not a bad person, but he doesn't assert his innocence.

Secondly, withdrawal would, obviously, cause the government substantial prejudice since the government had gone through a tremendous amount of effort in preparation and was, in fact, ready for trial on the morning that Mr. Neal desired to enter a guilty plea.

The third factor, delay in filing the motion, that probably weighs in favor of the defendant, that one factor, because he did file the letter within, I think, eight days of his rearraignment.

The fourth factor, whether withdrawal would substantially inconvenience the Court.  That, again, weighs against the defendant in this matter.  The Court has spent a huge amount of time and resources handling this case over a period of a number of years, dealing with various issues that were raised by Mr. Neal.

After working through all of those issues, the Court was fully prepared to try this case on the date scheduled, July 18th, when Mr. Neal finally agreed to, and did, enter a plea of guilty.

The fifth factor, close assistance of counsel, was available. There's no question Mr. Lawrence -- first of all, Mr. Lawrence, I think, was Mr. Neal's third lawyer in this case. Mr. Lawrence, I know, spent a great deal of effort and time on Mr. Neal's behalf, with a very difficult client and a very difficult case, facing, essentially, a mountain of evidence against him, in addition to the fact that the drug deals were controlled buys, as I recall.

**MR. QUINLAN:** That's correct.

**THE COURT:** So there were witnesses and tapes involving those buys. Then there was the recordings of Mr. Neal, his brother, and other persons in phone conversations on the prison phone, planning the murder of the confidential informant against him. So he tried to prevent that person from appearing at trial.

There was a plea by his brother, Shad Neal, who was prepared to -- had agreed to cooperate with the government and come in and testify against Mr. Neal -- against Byron Neal.

So there's no doubt in my mind that he had adequate assistance of counsel.

The sixth factor, whether the original plea was knowing and voluntary. I recall this plea very well, of course, but, in addition, I went back and read the transcript of the plea colloquy on July 18th. The Court actually had a more extensive plea colloquy with this defendant than I even do

in an ordinary case.

I'd point out that Mr. Neal seems to say -- has said this morning that he wasn't advised as to what the possible penalties were against him.  But I'm looking at page 21 of the transcript of the rearraignment, and this is me advising Mr. Neal.

I said:  "Mr. Neal, as to Count 1 and Count 2, the penalty ranges are the same.  Because you have a prior felony drug conviction, the minimum term of imprisonment as to Count 1 or Count 2 is ten years imprisonment.  There's a maximum of up to life imprisonment," and then I go on to explain the supervised release terms and so forth.

Then I went on:  "As to Count 3, the possession with intent to distribute charge, there is no mandatory minimum.  The maximum is 20 years."  Then, again, I talk about the fine range and supervised release.

Then I said:  "As to the conspiracy count charged in Count 4, there's no mandatory minimum.  There's a maximum similar to Counts 1 and 2 of life imprisonment."

And Count 5, the same -- well, not the same, but, "There's no mandatory minimum.  There's a maximum of up to 30 years."

I said, "Those are the minimum and maximum penalties for these charges that are contained in the indictment.  Do you understand these penalties?"

The defendant said:  "Yes, sir."

"THE COURT:  All right.  Do you have any question about the maximum possible penalties or what's called the mandatory minimum penalties, Mr. Neal?"

The defendant said:  "No."

"THE COURT:  Okay.  Do you understand ultimately it is going to be my job to decide what the sentence is in your case?  Do you understand that?"

Answer:  "Yes, sir.

"THE COURT:  What the government said is based on the charges that you are pleading guilty to, the minimum sentence will be ten years, the maximum could be life, or the sentence could be anywhere in between there.  Do you understand that, sir?

"THE DEFENDANT:  Yes, sir."

Then, of course, later on I asked you how do you plead to each of the five counts and you said you plead guilty to each one.

So I'm satisfied that your original plea was knowing and voluntary.

Seven, whether withdrawal -- allowing withdrawal of the plea would waste judicial resources.  That pretty much speaks for itself for the reasons I've already said, that that weighs against the defendant on this matter, too.

So for all of those reasons, I'm going to deny

Mr. Neal's motion to withdraw his guilty plea.

**THE DEFENDANT:**  Can I appeal it?

**THE COURT:**  Sure, you can appeal.

Now, let's talk about the sentencing.  There are no objections and no motions, so I will adopt the findings of the presentence report.  There's one caveat:  I think because of the sentencing memorandum you filed with the *Tickles* case --

**MR. QUINLAN:**  Yes, sir.

**THE COURT:**  -- my understanding is Count 2 -- Count 3, instead of a 30-year mandatory minimum, there's actually -- I mean, 30-year maximum, there's actually a 20-year maximum.

**MR. QUINLAN:**  Judge, with the representations put in the government's memo, that in light of the *Tickles* case, and in order to honor the representations of the sentencing ranges that were advised of Mr. Neal at his guilty plea, at the conclusion of today's hearing, the government will move to dismiss the two 851 bills of information that have been filed in advance of trial.

In light of not pursuing the 851 enhancements, the sentencing range for Count 3 would be a no mandatory minimum, but a maximum of up to 20 years.

**THE COURT:**  Twenty years.  All right.

So, otherwise, I'm going to adopt the findings of the presentence report.

Mr. Neal, you are at a total offense level 37,

criminal history category VI -- and VI is the worst criminal history category you can have; in other words, you're a career criminal because of your past record.

The guidelines are as follows:  Counts 1 and 4 would be 360 months to life; Count 2 -- I said I'm going to adopt -- I have to revise this and the guidelines as calculated by Probation.  The guidelines for Count 2 would actually become 240 months.

**MR. QUINLAN:**  No, it's Count 3, Judge.

**THE COURT:**  I'm sorry.

**MR. QUINLAN:**  1 and 2 should be the same as 4.

**THE COURT:**  You're right.  So Counts 1, 2 and 4, the guidelines are 360 months to life, 1, 2 and 4.  For Count 3, it's a restricted range of 240 months.  For Count 5, it's a restricted range of 360 months.  Those are the guidelines.

The supervised release guidelines:  Counts 1 and 2, eight years; Count 3, six years; Counts 4 and 5, three to five years.

**MR. QUINLAN:**  Actually, Judge, those should be revised in light of the 851 as well.  The supervised release maximums would be five years as to 1 and 2, and three years as to 3.  Those elevated numbers were calculated when the 851 was going to be pursued.

**THE COURT:**  Okay.  Thank you.

So let me restate that.  So the supervised

release guidelines for Counts 1 and 2 are five years; Count 3, three years; and Counts 4 and 5, three to five years.

The fine range is $20,000 to $18 million. The special assessment is a mandatory $100 for each count, or a total of $500.

Mr. Neal, at this time I'm going to allow you a chance to speak on your behalf. If there's anything else you'd like to say on your behalf, now is the time for you to speak, sir. If you do, speak up loudly and clearly, please.

**THE DEFENDANT:** Sir, I'd like to, first, apologize to my family, my kids, and everybody, and to the Court for being in here. During the time of the charges in jail, I was going through a lot of different stuff.

The charges, I'm -- you know, I'm really confused about it. You know, I saw the evidence. I don't really have no -- but, I guess, you know, I tried take the plea back because I plead, you know -- because at the time I was doing the years out there, I was trying -- like, when I first got out and came home in '05 -- '04 or '05, I went to the rehab, tried to get -- to get assisted and everything and, you know, to try to become a better person.

And during the time out there, somewhere I lost it, you know. During '06 and '05, I was, you know, working. Going through again in '06. I had a job at, like, the Dish Network. And dealing with a mental problem, you know,

different things were going on.  My life failed, but I ain't know at the time I was, you know, relapsing, dealing with my mental -- with my mental state and everything.

And somehow '07, I really, you know, started doing, you know, I guess, how it's saying, doing stuff.  I ain't had no really, I guess, knowledge of supposed to be doing or whatever.  So I ain't, you know, using that for it.  Because if I would have had any -- at the time if I would have had any knowledge of what was going on, I would have went -- because I was like telling my parole officer what was going on because I was -- not really telling him what was going on, because I didn't really know what's going on.

I didn't really realize until I went on the evaluation when they start asking me about my past.  Because when I was incarcerated, I felt like I had dealt with it; but on the street -- you know, when they started -- brought it back to my attention, and I'm realizing what was going on, I could have prevent, you know, I guess, if I had really knowed it.  But at the time, I didn't really had no knowledge, but stuff was going on, you know, to the best my knowledge.

But I'd like to, you know, just ask you, when you know, if -- how I saw it when I made the deal during trial, how they were telling me about the five and ten, and I thought it was zero to life, what he was saying, I thought it could have been together.  You know, that's when I -- you know, I

understand you made the ruling on it, but it was my -- you know, how the decision was made for me to plead, I wouldn't have done it, you know, dealing with my...

And then when I had the hearing, he told me they withdraw the rule at the set of the plea.  That's the only thing, you know, I really had to really show the reason why, you know, what will happen.  You know, because if we looking at -- if we going to -- if we going to -- if the Court going to look at just the charges, you know, itself and they ain't going to look at -- I can't explain what's really going on.  You know, you going to look at, like, that's what happened, but it's not what happened.

You know, so once he did that, and then I'm under pressure -- I ain't, you know, know what to do.  But I thought it was like -- when they told me why, I felt like it was a blessing when it -- you know, when it came down.  When he said, "Five to life," well, at first it was, I ain't had no other choice, by my age, to go to trial.  It didn't matter what -- you know, because he was saying 20 years -- what, 20 years, or whatever he was saying, I ain't had no other choice because of my age.

You know, I wasn't going to just go without my rights.  It didn't matter.  But if I had -- you know, I supposed to have, you know, a defense, or whatever.  But if somebody telling you they got -- you know, you ain't got no

choice, what can I do?  You know, that ain't no excuse.  But I'm saying, I was against the wall, you know.  And I feel like -- how I understood it was by five, meaning that by they billing how they told me, I felt like 10, I've been down four. Then by my mental, you know, they can go down, and I was going to be based out.  You know, I thought -- that's without -- you know, under pressure.

Then when I realized -- when I wrote you the letter, I realized that's impossible because I was still on probation for the state.  That's six and a half years.  Once I copped out, that's when I hurry up and wrote the letter. Because I wasn't -- I ain't, you know -- I was under -- because what can, you know -- why would I take all -- you know, just give my rights up and take all this time without fighting?

But if you ain't got no -- no matter what, police -- you know, I'm looking at the news, police, you know, they would have the right to go to trial with a lawyer who tried to help them, you know.

But my situation, if he telling, you know -- state appointed or whatever, he telling me he ain't going to fight, what can I do?

**THE COURT:**  All right.  Mr. Neal, I'm not going to cut you off, but you're repeating yourself now, sir.  Is there anything additional you would like to say?

**THE DEFENDANT:**  Well, I just ask you -- you know,

hope you take everything, considerate yourself, how -- you know, what it -- you know, and just give me something, I guess, to live with and work with, where I can be able to get a -- you know, go out and whenever, you know, if I possibly, you know, to get out and go with my kids at all, try to do -- you know, be better, productive.  I was, you know, doing what I could, what I'm saying.

I was out there.  I tried.  They did not -- you know, there's a whole lot of stuff.  And a lot of stuff during that time, I don't really know some of stuff to do, but if I -- you know, about, you know.  I don't really know what else to tell you, Judge.  That's all I have to tell you, and I hope you take, you know, everything in consideration.

**THE COURT:**  All right.  Thank you very much.

Mr. Lawrence?

**MR. LAWRENCE:**  Judge, since *Booker* has been outlawed -- I mean, the Court is well aware that the Court can do whatever it wants for an individual defendant now; and that is, fashion a sentence to fit that individual's situation, that individual's history, and that individual's age and so forth.

Now, as you see in the memo that I produced, and I'm sure you've read it, Mr. Neal has had no less --

**THE COURT:**  I have read your memo, yes.

**MR. LAWRENCE:**  -- no less than a tragic life.  He did at one point -- at a couple of points, he was really trying to

get himself together in spite of the family history and the criminal history and everything else.  He really made efforts toward that.  But he's here today now, and we understand that.

However, under *Booker* -- since post-*Booker*, you don't have to simply slap him with a number of years just to slap him with a number of years.  What is important under the law, and the purpose of sentencing, is:  What will Mr. Neal be like when he gets out of prison?  In other words, a sentence has to be fashioned so that when he gets out of prison there is little chance that he's going to commit more crime, that he will be rehabilitated.

We understand retribution is important because the crimes are serious.  However, their effort to kill the CI was totally amateurish, fortunately, and it didn't happen.  So Mr. Neal is now approximately 40 to 41 years old.  According to the Sentencing Commission, once you're in your 40s, in your 50s, you're not a threat to society.

We understand the retribution aspect, and that has to be taken into consideration; but, you know, 15, 20, 30 years, Judge, that's really just not necessary for this man.

The ten-year minimum would be more than adequate, or if necessary to have him released when he's closer to 50 because of what the Sentencing Commission says on age and recidivism, that would be reasonable.  But to go beyond that is just totally unnecessary, Judge.

So we're hoping that the Court will stay as close to the ten-year minimum as possible.

**THE COURT:**  All right.  Thank you.

Mr. Quinlan?

**MR. QUINLAN:**  Judge, the pressures and the lack of alternatives that Mr. Neal is talking about that he was facing when he made his decisions to plead guilty or go to trial and all the like are all of his own doing.

It's his criminal history that's gone on that's led him to be facing the alternatives that he was facing. That's what led to him to turn down -- you know, he didn't like the 20-year plea offer that was made well before trial.  Then he started acting out of desperation to try to have the CI killed, as is reflected in the indictment and the evidence in the factual basis.

When that lead to the superseding indictment, he then took the next desperate alternative to start feigning a mental illness.  While Mr. Neal makes representations about his mental history, when you look it, he appears to have anger management issues.  But we had an extensive hearing with Dr. Culver and numerous reports submitted to the Court to assess his competency to proceed as well as -- and it ultimately led to the withdrawal of the not guilty by reason of insanity plea because it had no foundation.

So at the end of the day, I don't know that

Mr. Neal presents to you any different than any other defendant that comes here that has a, quote, unquote, tragic lifestyle. He's made bad decisions throughout his life; he continued to make bad decisions after he was indicted in this case.

Quite frankly, Judge, a sentence, half of what he had an offer by way of a plea agreement, as Mr. Lawrence is urging now, that subsequently led to putting the life in danger of an individual who was cooperating with law enforcement, I just think it is wholly unsubstantiated and not appropriate.

At the end of the day, Judge, the government is ask for a guideline sentence, and Mr. Neal should be sentenced as such.

**THE COURT:** All right. The Court has considered, obviously, everything in the presentence report, and I have a great deal of information and background about the circumstances of these offenses and about this particular defendant.

Mr. Neal, you were born, it looks like, May 29, 1970. So you are 41 years old. It says you attended school through the eighth grade and then at some point you were able to obtain a GED diploma. You have very little work history, even though you're 41 years old. Of course, part of the reason is you've spent so much time incarcerated.

I notice that you were incarcerated from 1993, it says, through September of 2004. So for 11 years straight

there, you were incarcerated in state custody.  Then you've been in custody for this offense since December 13th, 2007.  So since 1993, that's for 18 years, you've been in prison except for roughly three years between 2004 and 2007.

I'm very familiar with your mental health history and problems.  There's no doubt you have some significant mental health issues that you've had for many years.  It's not an excuse for what you did, and it did not make you mentally incompetent to stand trial.

The Court, you know, we spent a great deal of time and effort having you examined and dealing with the mental health issues in this case to assure that you were competent to stand trial or to enter a guilty plea, and the Court was satisfied before you entered the guilty plea that you were competent to stand trial, and that there was no basis for the previous insanity plea; in other words, you knew right from wrong.  You clearly know right from wrong.

You also have a significant history of abusing alcohol and illegal drugs, various illegal drugs.  All that's set forth in the presentence report.  As I've said, you have little or no vocational skills or work history.

You have some capabilities, obviously, since you were able to obtain a GED.  That takes some capability there and intelligence.  Although, there is some indication that you're in a lower range of what's considered normal

intelligence, you're in a lower range or borderline range, you were able to obtain a GED.

I noted in the record some vocational report where it said you had the capabilities to be trained for certain jobs and occupations, you know, blue collar type jobs. So you have some capabilities there. Unfortunately, for whatever reason -- and you did -- there's no doubt, you come from a dysfunctional -- a very dysfunctional family background. Again, all of that's outlined in the presentence report.

What you have been convicted of are several very significant criminal offenses. Counts 1 and 2 are the charges of distribution of 50 grams or more of cocaine base or crack cocaine on two different dates.

The third count is knowingly possessing with intent to distribute a certain lesser quantity of cocaine, which was found, I believe, in your car on the day you were arrested.

Then, as was stated, you made another really bad decision by trying to plan to kill -- have the confidential informant in the drug case against you killed by hiring a hit man in advance of the then-scheduled trial date in your drug case.

Fortunately, that plot was intercepted and no one was injured. But your conversations, a number of them, were recorded over the prison phone, and it's pretty clear that

you fully intended to, I think, pay $5,000 to a person that you thought was a hit man to kill this confidential informant so that you would not be convicted at the drug trial.

So, as I stated -- oh, well, I didn't state yet, but I'll also note that you have a very significant past criminal history.  You have multiple prior convictions.  Starting in 1989, at age 18, you pled guilty to carrying a concealed weapon in Pascagoula.  You received a fine for that.

In 1990, at age 19, you were convicted of possession of cocaine in Tangipahoa Parish.  You were sentenced to four years in prison, which was suspended.  You were placed on probation.  Then a year or two later, your probation was revoked and you were sentenced to four years in prison.

In 1990, at age 20, you were convicted of carnal knowledge of a juvenile, pled guilty, sentenced to five years, suspended sentence.  Again, that was revoked and you were sentenced to serve the five years.

Later in 1990, guilty of solicitation of a minor to distribute a controlled dangerous substance.  You pled guilty.  You were sentenced to 25 years.  That was suspended.  You were placed on five years probation.  The probation was revoked and you were sentenced to 25 years.  I'm not sure how this occurred, but, apparently, somehow you were released on what's called diminution of sentence on September 10th of 2004.

So that was the -- essentially, the 11 years

you've spent in prison from 1993 to 2004, as I said earlier. You're still on probation through March 15th, 2017, on that last charge.

Beyond that, you were convicted of distribution of crack cocaine in 1992, found guilty, sentenced to seven years in prison, and, apparently, you served that sentence. It must have been concurrent with your other sentence.

So you have a total of 12 criminal history points -- I'm sorry, 14 criminal history points, which puts you in criminal history category VI, which it runs from I to VI -- VI is the worst criminal history category you can have -- and you are considered a career criminal because of that.

You, apparently, believe that your lawyer didn't do a good job for you. But I've got to tell you, as was pointed out earlier today, if you had gone to trial and been convicted on these with the enhancements, you might well have been facing a mandatory life sentence. A mandatory life sentence. And in the federal system, life means life. You can never get out for any reason, barring a presidential pardon.

So based on all of that, I think an appropriate sentence is a sentence -- and I've got to take into account all of the factors set forth in 18, U.S.C., Section 3553(a).

I need to consider -- or must consider the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence

imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  Then, of course, I must take into account the guidelines and so forth.

My job is to impose a sentence which is sufficient, but not greater than necessary to comply with all of these factors, which is what I am going to do.

I think that sentence is to sentence you at the bottom of the guideline range, which is 360 months.  I think that's an appropriate sentence considering all of the circumstances I've just outlined.

The sentence on Count 3, obviously, cannot exceed 240 months, but it's all going to be made concurrent with each other.

Anybody wish to say anything else before I impose sentence?

**THE DEFENDANT:**  Yes, sir.  I would like to state for the record that I'm not going -- I'd like to appeal this, and it's conspiracy dealing with my attorney and all this stuff going on.

**THE COURT:**  All right.  You'll be allowed to take an

appeal, if you care to file an appeal, if you care to do that.

Pursuant to the Sentencing Reform Act of 1984, and considering the provisions found in 18, U.S.C., Section 3553, and for the reasons orally stated, it is the judgment of the Court that the defendant, Byron Neal, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 360 months on each of Counts 1, 2, 4 and 5, said terms to be served concurrently with each other.

The defendant is hereby sentenced to a term of 240 months on Count 3.  Again, that sentence to be served concurrently with the sentences imposed on the other four counts.

Because the minimum and maximum of the guideline sentencing range exceeds 24 months, the Court, at the time of sentencing, shall state in open court the reasons for imposing a sentence at a particular point.

The sentence of 360 months is imposed, which takes into account the seriousness of the offense, the defendant's prior criminal history, and all of the other factors which the Court has orally recited here today.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of five years. This term consists of five years as to each of Counts 1 and 2 and Counts 4 and 5.  In addition, the defendant shall be placed on supervised release as to Count 3 for three years, but all

such terms of supervised release to run concurrently with each other.

Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which he is released.

While on supervised release, the defendant shall not commit any federal, state, or local crime; shall be prohibited from possessing a firearm, ammunition, destructive device or any other dangerous weapon; the defendant shall not possess a controlled substance; shall cooperate in the collection of DNA; and shall comply with all other standard conditions of supervised release, including the following special conditions:

One, the drug abuse treatment and/or testing condition;

Two, the alcohol treatment condition;

Three, the mental health treatment condition;

Four, the orientation and life skills condition.

The Court finds that this defendant is not able to pay a fine.  The Court waives the fine in this case.

It is ordered that the defendant shall immediately pay to the United States the mandatory special assessment of $100 for each count, or a total of $500.

The Court also recommends to the Bureau of Prisons that while incarcerated Mr. Neal be afforded an

opportunity to enroll in the Bureau of Prisons substance abuse programs, the mental health treatment programs, and vocational programs.

There was no plea agreement.  This was a straight up plea; right?

MR. LAWRENCE:  Yes, sir.

MR. QUINLAN:  That's right.

THE COURT:  Did I miss anything in the sentence?

MR. QUINLAN:  Judge, I would just ask the Court to -- because, obviously, Mr. Neal is intending to appeal this sentence, could I inquire of the Court the basis for the sentences as to Counts 4 and 5?

Does the Court, in assessing the factors under 18, U.S.C., 3553(a), could you articulate for the record that the 360-month sentence applies to those facts and those factors, as I think you have implied that?  I'm just asking...

THE COURT:  I think it's clear that I intended my statement or explanation of why I sentenced the defendant to what I have done is based on all of the factors and it applies to all of the counts.

MR. QUINLAN:  Okay.  Thank you, sir.

THE COURT:  Yeah.  Okay.

Mr. Neal, you do have the right to appeal the sentence that I've just imposed.  If you wanted to appeal the sentence, any such appeal would ordinarily have to be filed

within 14 days of today.

So if you want to appeal, you can let Mr. Lawrence know that.

**THE DEFENDANT:**  I'd like to let the Court know.

**THE COURT:**  Okay.  But something has to be filed in the record is what I'm saying.

**THE DEFENDANT:**  I don't have -- can you appoint somebody?

**THE COURT:**  Okay.  Well, Mr. Lawrence will take care of that for you and then we'll go from there.

Mr. Lawrence, will you see that you file a notice of appeal for Mr. Neal?

**MR. LAWRENCE:**  Yes, sir.

**THE COURT:**  Okay.

If you need a lawyer to represent you on the appeal and cannot afford one, the court would appoint an attorney for you.  If you needed a copy of today's -- a transcript of today's sentencing hearing, or any other hearing or proceeding in your case, and you cannot afford those transcripts in connection with your appeal, we would furnish those transcripts to you without any cost to you.

Do you understand those rights, sir?

**THE DEFENDANT:**  Yes.

**THE COURT:**  All right.  Did you dismiss the counts?

**MR. QUINLAN:**  I was going to do that.

Judge, at this time, consistent with the representations made in the government's sentencing memo, the government would move to dismiss the bills of information that established prior convictions as to Mr. Neal. There were two separate filings.

**THE COURT:**  All right.  So ordered.

The defendant is remanded for service of his sentence.

**MR. LAWRENCE:**  Thank you, Judge.

**THE DEPUTY CLERK:**  All rise.

(WHEREUPON, the proceedings were concluded.)

*****

**CERTIFICATE**

I, Jodi Simcox, RMR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

                          S/ Jodi Simcox, RMR, FCRR
                          Jodi Simcox, RMR, FCRR
                          Official Court Reporter