U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED | Jul 28 2025

CAROL L. MICHEL
CLERK
SP                                    Mail

IN THE UNITED STATES DISTRICT COURT
THE EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA,              *

        Plantiff,                      *

        v.                             *    Crim. No. 2:07-cr-00425-CJB-ALC-1

BYRON NEAL,                            *

        Defendant.                     *

                *    *    *

## MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) AND FIRST STEP ACT OF 2018

COMES Defendant, BYRON NEAL ("Neal"), appearing *pro se,* and in support

of this memorandum would show as follows:

### I. JURISDICTION

The district court's jurisdiction to correct or modify a defendant's sentence is

limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582.

The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is

extremely limited. *Dillon v. United States*, 130 S.Ct. 2683, 2687(2010). It is

black-letter law that a federal court generally "may not modify a term of

imprisonment once it has been imposed." *Id.* However, Congress has allowed an

exception to that rule "in the case of a defendant who has been sentenced to a term

1

of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

## II. STATEMENT OF THE CASE

### A.    Procedural Background

On February 5, 2009, a grand jury sitting in the United States District Court for the Eastern District of Louisiana, returned a five (5) count Superseding Indictment charging Neal and a co-defendant, Shad Neal. See Doc. 52.[1]  Counts 1s -2s charged Neal with Distribution of Fifty Grams or More of Cocaine Base, in violation of 21 U.S.C. §§ 841 (a)(1) and (b)(1)(A). *Id.* Count 3s charged Neal with Possession with Intent to Distribute a Quantity of Cocaine Base, in violation of 21 U.S.C. §§ 841 (a)(1) and (b)(1)(C). *Id.* Count 4s charged Neal with Conspiracy to Murder CS-07-126261, a Person Assisting the United States Drug Enforcement Administration, in violation of 18 U.S.C. §§ 1111, 1114, and 1117. *Id.* Count 5s charged Neal with

---

[1] "Doc." refers to the Docket Report in the United States District Court for the Eastern District of Louisiana in Criminal No. 2:07-cr-00425-CJB-ALC-1, which is immediately followed by the Docket Entry Number. "PSR" refers to the Presentence Report in this case, which is immediately followed by the paragraph ("¶") number.

Tampering with a Witness or Informant, in violation of 18 U.S.C. § 1512(a)(1)(A). *Id.* Neal was also mentioned in a Notice of Forfeiture, in violation of 21 U.S.C. § 853. *Id.*

On July 11, 2011, the government filed a Superseding Bill of Information to establish prior conviction pursuant to 21 U.S.C. § 851. See Doc. 193.

On July 18, 2011, a Re-arraignment was held and Neal pleaded guilty as to Counts 1s through 5s of the Superseding Indictment without a written Plea Agreement. See Doc. 196.

On July 19, 2011, Neal filed a Motion to Withdraw Plea of Guilty. See Doc. 204.

On October 27, 2011, Neal was sentenced to a total term of 360 months of Imprisonment, 5 years Supervised Release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $500. See Docs. 219 & 223.

On October 29, 2011, Neal timely filed a Notice to Appeal. See Doc. 221.

On January 28, 2013, the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") affirmed Neal's sentence and conviction. See Doc. 249.

On May 21, 2013, Neal filed a Petition for Writ of Certiorari. No Doc. Entry.

On October 7, 2013, the Supreme Court denied Neal's Petition for Writ of Certiorari. See Doc. 256.

On October 8, 2014, Neal filed a Motion to Vacate, Set Aside, or Correct Sentence under U.S.C. § 2255 ("§ 2255 Motion"). See Doc. 259.

On March 6, 2015, the government dismissed Neal's § 2255 Motion. See Doc. 268.

On March 31, 2015, Neal filed a Notice of Appeal with regard to the dismissal of his § 2255 Motion. See Doc. 269.

On March 8, 2016, the Fifth Circuit denied Neal's Certificate of Appealability. See Doc. 280.

On June 27, 2016, Neal filed a § 2255 Motion, which was denied on May 24, 2017. See Docs. 281, 300, 302.

On June 13, 2017, Neal filed a Notice of Appeal re: Denial of his § 2255 Motion. See Doc. 303.

On September 6, 2017, the Fifth Circuit denied Neal a Certificate of Appealability since he has not made the requisite showing. See Docs. 310, 313.

On August 6, 2018, Neal filed a Motion to Reduce Sentence re: USSC Amendment, which was denied on March 11, 2020. See Docs. 314, 317, 327. Neal appealed the Order, however, the Fifth Circuit further affirmed this Court's Judgment. See Docs. 328, 396.

4

**B.    Statement of the Relevant Facts**

1.    Offense Conduct

Beginning in July 2007, law enforcement officials ("LEO"), with the cooperation of a confidential source ("CS"), began an investigation into the suspected cocaine base distribution activities of Byron Neal. LEO assigned the CS a registration number of CS-07-126261. During the investigation, the CS conducted two purchases of cocaine base from the defendant. The purchases of cocaine base were conducted by the CS on July 18,2007, and October 29,2007. See PSR ¶ 15.

On July 18,2007, the CS spoke with the defendant in a recorded telephone conversation, in which the defendant agreed to sell the CS two and one-half ounces of cocaine base for $1,700. The CS arranged to meet with the defendant at a Circle K store in Hammond, Louisiana, to complete the transaction. Later on the same date, the CS was given $1,700 in government funds, and was equipped with a recording device. LEO conducted surveillance as the CS drove to the Circle K store, and parked at a car wash behind the store. LEO observed the defendant, driving a Chevrolet Malibu automobile, arrive at the location. The CS entered the passenger side of the defendant's vehicle, and purchased cocaine base with a net weight of 55.2 grams from him for $1,700. * 55.2 grams of cocaine base (Byron Neal). See PSR ¶ 16.

On October 29, 2007, the CS again spoke with the defendant in a recorded telephone conversation, in which the defendant agreed to sell the CS two and one-fourth ounces of cocaine base for $1,700. The CS arranged to meet with the defendant at a Chevron gas station on Wardline Road in Hammond, Louisiana, to complete the transaction. Later on the same date, the CS was given $1,700 in government funds, and was equipped with a recording device. LEO conducted surveillance as the CS drove to the Chevron Station. LEO observed the defendant, driving a Mazda 626 automobile, arrive at the location. The CS entered the passenger side of the defendant's vehicle, and purchased cocaine base with a net weight of 51.2 grams from him for $1,700. * 51.2 grams of cocaine base (Byron Neal). See PSR ¶ 17.

LEO continued their surveillance on the defendant as he returned to his residence, an apartment in a complex on West Lee Hughes Road, in Hammond, Louisiana. Later on October 29,2007, LEO obtained and executed a search warrant for the residence, and any vehicles located at the residence. During the search of the apartment, LEO recovered $1,769 from the defendant's pants pocket, of which $1,700 was identified as the government funds used by the CS to purchase cocaine base from the defendant. LEO also searched the Mazda automobile driven by the defendant, and found a plastic bag in the armrest, which contained cocaine base with a net weight

6

of2.3 grams. * 2.3 grams of cocaine base (Byron Neal). See PSR ¶ 18.

Byron Neal was arrested in Hammond, Louisiana, on a federal warrant on December 13, 2007. See PSR ¶ 19.

Following the arrest of Byron Neal, it became clear that the defendant was unwilling to enter into a plea agreement with the government, whereupon the government and the defense began preparing for trial, which was set for February 17, 2009. In the days leading up to February 17, 2009, LEO received information from a confidential source (hereinafter described as CS-1), that Byron Neal was seeking to have CS-07-12626 (hereinafter described as CS-2), killed prior to February 17, 2009, in order to prevent CS-2 from testifying against the defendant at trial. LEO learned of the defendant's plan on January 26, 2009. See PSR ¶ 20.

LEO spoke with CS-I, and learned that Byron Neal was negotiating with a cooperating defendant to hire a hit man to kill CS-2. LEO spoke with the cooperating defendant regarding the threat and the plan being formulated by Byron Neal to kill CS-2 prior to the trial date. According to the cooperating defendant, Byron Neal contacted his brother Shad Neal on January 25, 2009, to enlist Shad Neal's assistance in the murder plot. LEO obtained a copy of the recorded telephone call from the Orleans Parish Prison between Byron Neal and Shad Neal on January 25, 2009. The recorded conversations corroborated the information provided by the cooperating

defendant regarding Byron Neal's desire to have CS-2 killed before the trial date. See PSR ¶ 21.

The following telephone conversations involving Shad Neal, Byron Neal, and an unidentified female were recorded by LEO on January 25, 2009. See PSR ¶ 22.

Byron Neal discussed his plan to murder CS-2 with an unknown female and Shad Neal. During this recorded conversation Bryon Neal, who was incarcerated in the Orleans Parish Prison, asked the female: "Is Boogie over there? ... I need to talk to him about something very important." In explaining why he needed to speak to Shad Neal, Byron Neal further stated to the female, "you want me to come home? ... That little problem, you know, ...somebody, my peeps, got to take care of it. That's the only way." Byron Neal further inquired about his ability to borrow two to three thousand dollars from the female when he asked "you gonna lend me two or three? ... I just want to make sure before I lock the deal." Finally, Byron Neal told the female "I got to do, what I got to do" and that he "can't take no chances." See PSR ¶ 23.

During the same recorded conversation involving Byron Neal after the female handed the telephone to Shad Neal, Byron Neal asked Shad Neal: "What's his name still running around?" To which Shad Neal replied "Yeah," Later in the conversation, Byron Neal stated to Shad Neal, "I got someone to holler at you." and "it's gonna be three (referring to the price to have CS-2 killed.)" When Shad Neal inquired "When

you going back to court?" Byron Neal replied, "My trial is February 17th. Yeah, see what I am saying?" During this conversation with Shad Neal, Byron Neal added "I got to do something." "Thirty years I am looking at." This conversation also included a discussion contemplating Byron Neal providing a third party Shad Neal's cellular telephone number to arrange a future meeting between Shad Neal and a third party Byron Neal and Shad Neal believed would kill C-2 for payment. See PSR ¶ 24.

On January 26, 2009, LEO told the cooperating defendant to introduce a Task Force Agent ("TFA") as a hit man willing to carry out the contract to kill CS-2. The TFA was contacted by the cooperating defendant from the Orleans Parish Jail. The cooperating defendant, as instructed by LEO, allowed Byron Neal to talk to the TFA regarding the murder for hire plot. During this recorded conversation, Byron Neal provided the TFA with a contact number for Shad Neal. The TFA contacted Shad Neal, and arranged for a meeting on January 27, 2009 to negotiate the terms of the murder for hire plot. See PSR ¶ 25.

On January 27, 2009, the TFA made arrangements to meet Shad Neal in Hammond, Louisiana. The purpose of this meeting was to further negotiate the terms of the murder for hire contract. The telephone calls between the TFA and Shad Neal were recorded by LEO. See PSR ¶ 26.

Later on January 27, 2009, Shad Neal and the TFA met at the Race Trac Gas Station located on Highway 51 in Hammond, Louisiana. The TFA was equipped with an audio and video recording device during the meeting. Shad Neal was observed by surveilling LEO as he entered the TFA's vehicle. While inside the vehicle, Shad Neal discussed the murder of CS-2. Shad Neal provided the name of CS-2 to the TFA and told him they needed CS-2 "taken care of." Shad Neal agreed to provide the TFA with $5,000 in United States currency as a down-payment for carrying out the killing of CS-2. He agreed to provide down-payment on January 30, 2009. Shad Neal then showed the TFA several locations that CS-2 frequented in Ponchatoula, Louisiana. See PSR ¶ 27.

On the same date, the TFA and Shad Neal traveled to a residence on Lavigne Drive in Ponchatoula, Louisiana. While at this residence, Darryl Neal (true name, Darrell White), Shad Neal's brother, entered the TFA's vehicle, along with Shad Neal. At that time, Darryl Neal directed Shad Neal and the TFA to CS-2's residence. Darryl Neal pointed the residence at 193 Bernice Drive in Ponchatoula, Louisiana to the TFA. Darryl Neal also told the TFA that CS-2 was employed as a security guard at the bowling alley in Hammond, Louisiana. The TFA then drove Darryl Neal back to his (Darryl Neal's) residence. The TFA and Shad Neal returned to the Race-Trac Gas Station in Hammond, Louisiana, where Shad Neal instructed the TFA to follow him

10

(Shad Neal) to the bowling alley in Hammond, Louisiana. While at the bowling alley, Shad Neal and the TFA were unable to locate CS-2. The negotiations for the murder of CS-2 continued, and Shad Neal made arrangements to meet with the TFA on January 30, 2009, to provide the down-payment. The TFA and Shad Neal then left the bowling alley. See PSR ¶ 28.

Shortly after leaving the bowling alley on January 27, 2009, Shad Neal was stopped by the Hammond Police Department for a traffic violation. During the traffic stop, LEO arrived and placed Shad Neal under arrest for conspiracy to murder a person assisting the United States Drug Enforcement Administration. See PSR ¶ 29.

After he arrived at the Tangipahoa Parish Sheriffs Office, Shad Neal was interviewed by LEO. Shad Neal voluntarily stated that he was contacted by his brother, Byron Neal, who asked him to assist in the killing of CS-2. According to Shad Neal, he received a three way call from an individual identified as Jessica, whose last name was unknown to him ("LNU"), Byron Neal's girlfriend. During the three way call, Byron Neal told Shad Neal to "come to the house" so he (Byron) could talk to him. Once Shad got on the phone, Byron told Shad he needed Shad to do something for him. Byron told Shad that Jessica would give him (Shad) the money. It was during this conversation that Shad stated that he and Byron first discussed having CS-2 killed. Shad Neal indicated that he and Byron had several subsequent

11

conversations regarding the killing of the CS-2, in which Byron told Shad that it (the killing) was urgent and time was of the essence. Shad Neal stated that he was told by Byron to show the TFA where CS-2 resided, and then provide the TFA with the downpayment for the murder of CS-2. See PSR ¶ 30.

According to Shad Neal, Byron wanted to murder CS-2 in order to prevent CS-2 from testifying against him (Byron) on February 17, 2009. Shad Neal provided written and verbal statements to LEO admitting his involvement in the plot to kill CS-2. LEO asked Shad Neal if Darryl Neal and Jessica LNU were aware of the plot to kill CS-2. Shad stated, "Everyone knew what the deal was." Shad further advised LEO that he (Shad) did not know where CS-2 lived; therefore, Darryl Neal had to show him how to locate CS-2. Additional investigation by LEO determined that there was insufficient evidence to charge Darryl Neal and Jessica LNU in connection with the instant offense. See PSR ¶ 31.

### 2.    Plea Proceedings

On July 18, 2011, a Re-arraignment was held and Neal entered a guilty plea on Counts 1s through 5s of the Superseding Indictment without a written Plea Agreement. See Doc. 196.

The change of plea transcript, read in its entirety, shows that the district court did a thorough job confirming that Neal understood the consequences of his guilty

12

plea, the rights he was waiving by pleading guilty and that his guilty plea was free and voluntary. See Doc. 206. The district court addressed all the relevant subsections of Rule 11(b) before accepting Neal's guilty plea. In accepting Neal's guilty plea, the district court complied with Federal Rule of Criminal Procedure 11(b). Before accepting the guilty plea, the district court placed Neal under oath as required by Rule 11(b)(1). *Id.* The district court informed Neal that his answers should be truthful or he could face prosecution for perjury or making false statements as required by Rule 11(b)(1)(A), and that Neal could ask questions or confer with counsel at any time. *Id.* On multiple occasions, the district court confirmed Neal understood he had the right to plead not guilty and continue with his trial as required by Rule 11(b)(1)(B) and (C) and on each occasion Neal replied, "Yes sir," or that it was his desire to go forward with the guilty plea. *Id.* The district court confirmed with Neal that he understood his right to counsel and that he was satisfied with the representation he received as required by Rule 11(b)(1)(D). *Id.* The district court also confirmed that Neal understood his right to confront and cross examine witnesses, his right to remain silent, his right to subpoena witnesses and testify on his own behalf and that he was waiving those rights by pleading guilty as required by Rule 11(b)(1)(E) and (F) and Neal repeatedly acknowledged that he understood these rights. *Id.*

13

The district court also explained the nature of each charge in the superseding indictment as required by Rule 11(b)(1)(G). The minimum and maximum penalties as well as special assessments were explained to Neal as required by Rule 11(b)(1)(H) (I) and (L). *Id.* The role of the sentencing guidelines in the district court's sentencing decision was discussed with Neal as well as required by Rule 11(b)(1)(M). *Id.* The district court also confirmed that Neal was pleading guilty freely and voluntarily as required by Rule 11(b)(2). *Id.* Finally, Neal swore to the accuracy of a factual basis which set forth his criminal conduct for the guilty plea to Counts 1-5 of the superseding indictment as required by Rule 11(b)(3). *Id.* Finally, on five separate occasions after his inquiry regarding the possibility of going to trial as to the conspiracy count, Neal affirmed his guilt as to all the counts, including Counts Four and Five, in the superseding indictment. *Id.*

On July 19, 2011, Neal filed a Motion to Withdraw Plea of Guilty. See Doc. 204.

### 3.    Presentence Report Calculations

On October 8, 2008, the U. S. Probation Department issued a PSR, which counted the offense conduct from the government's case files and agents. See PSR ¶¶ 38-69. The PSR recommended a Base Offense Level of 26 on Counts 1s-3s of the Superseding Indictment pursuant to U.S.S.G. § 2D1.1. See PSR ¶ 40. However, the

PSR recommended a Base Offense Level of 33 on Counts 4s-5s of the Superseding Indictment pursuant to U.S.S.G. § 2A1.5. See PSR ¶ 46. The offense level is enhanced four (4) levels because the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder, pursuant to U.S.S.G. §2A1.5(b)(1). See PSR ¶ 47. The base offense level is increased by two (2) levels as Neal was a leader in criminal activity that involved fewer than five participants, pursuant to U.S.S.G. §3B 1.1(c). See PSR ¶ 49. Neal is considered a "career offender" because the instant offense is a felony involving a crime of violence, and Neal has at least two prior felony convictions of a controlled substance offense. In accordance with U.S.S.G. §4B1.1(b), the offense level is 37. However, the offense level computations for the counts of conviction result in a higher offense level of 39. See PSR ¶ 58. Neal's offense level was reduced by two (2) levels for the acceptance of responsibility. See PSR ¶ 59. Neal has a total of fourteen (14) criminal history points and a Criminal History Category of VI because he's a career criminal. See PSR ¶ 70. His Total Offense Level is 37 in Criminal History Category VI, which yielded an advisory Guideline range of 360 months to Life imprisonment. See PSR ¶ 117.

   4. <u>Sentencing Proceedings</u>

At sentencing, on October 27, 2011, Neal was sentenced to a total term of 360 months of imprisonment as to counts 1s, 2s, 4s and 5s to be served concurrently with

each other; and 240 months as to count 3s to be served concurrently with counts 1s, 2s, 4s and 5s. See Doc. 223. The Court ordered that Neal be placed in the following programs: 1) substance abuse treatment program; 2) mental health treatment program; and 3) vocational training program. *Id.*

Upon release from imprisonment, Neal shall be placed on supervised release for a for a term of 5 years as to counts 1s, 2s, 4s and 5s and 3 years as to count 3; all such terms to be served concurrently with each other. *Id.* The court imposed the mandatory and standard conditions of supervision with the additional special conditions that he participate satisfactorily in a treatment program relating to substance and/or alcohol abuse; mental health; and life skills. *Id.* Neal does not have the resources with which to pay a fine. Therefore, the Court waived the fine. The Court ordered payment of a mandatory special assessment fee of $500. *Id.* at 23. A notice of appeal was filed on October 29, 2011. See Doc. 221.

    5.    Appellate Proceedings

On December 24, 2009, Neal argued the following on appeal: (1) whether the District Court violated Rule 11 of the Federal Rules of Criminal Procedure in accepting Neal's Guilty Plea to Counts 4s and 5s of the Superseding Indictment; (2) whether the District Court abused its discretion in denying Neal's Motion to Withdraw his Guilty Plea ; and (3) whether this Court's precedent in *United States*

*v. Tickles*, 661 F.3d 212 (5th Cir. 2011), is binding in the absence of any Supreme Court opinion overruling it.

The Fifth Circuit affirmed the district court's denial of Neal's Motion to Withdraw his Guilty Pleas and affirmed the sentences imposed on Counts 1s, 2s, and 3s of the Superseding Indictment on January 28, 2013. See Doc. 249.

On May 21, 2013, Neal filed a Petition for Writ of Certiorari. No Doc. Entry.

On October 7, 2013, the Supreme Court denied Neal's Petition for Writ of Certiorari. See Doc. 256.

### 5.    Postconviction Proceedings

On October 8, 2014, Neal filed a § 2255 Motion. See Doc. 259. In his motion, Neal asserts ineffective assistance of counsel led him to involuntarily and unknowingly plead guilty (Ground Two) and that his counsel ignored his desire for trial, misrepresented the consequences of his guilty plea and failed to argue Neal's claimed mental health issues. (Ground One). Finally, Neal urges that his 360 month sentence was grossly disproportionate to the crimes he was convicted of and did not take into account his mental health issues. (Ground Three).   The government dismissed Neal's § 2255 Motion on March 6, 2015. See Doc. 268.

On March 31, 2015, Neal has moved for a certificate of appealability (COA) to appeal the denial of his § 2255 motion. Because Neal has failed to make the

requisite showing, his motion for a COA was denied on March 8, 2016. See Doc. 280.

## III. DISCUSSION

As a preliminary matter, Neal respectfully requests that this Court be mindful that *pro se* complaints are to be held "to less stringent standards than formal pleadings drafted by lawyers," and should therefore be liberally construed. See *United States v. Kayode*, 777 F.3d 719 (5th Cir. 2014); *Estelle v. Gamble*, 429 U.S. 97 (1976) (same); and *Haines v. Kerner*, 404 U.S. 519 (1972) (same).

### A.    Federal Courts Have the Jurisdiction and Power to Reduce An Existing Sentence

This Court has the power to adjust Neal's sentence. District courts no longer need a motion from the Bureau of Prisons to resentence a federal prisoner under the compassionate release provisions of 18 U.S.C. § 3582(c)(1)(A)(i). A district court may now resentence if the inmate files a motion after exhausting administrative remedies. The reasons that can justify resentencing are not limited to medical, age, or family circumstances. A district court may resentence if the inmate demonstrates extraordinary and compelling reasons for a sentence reduction. Such reasons are present in this case.

### 1.   Historical Framework

Congress first enacted the compassionate release provisions in 18 U.S.C. § 3582 as part of the Comprehensive Crime Control Act of 1984. That legislation provided that a district court could modify a final term of imprisonment when extraordinary and compelling reasons warrant such a reduction. 18 U.S.C. § 3582(c)(1)(A)(i). In 1984, this provision was conditioned on the Bureau of Prisons (BOP) filing a motion in the sentencing court. Absent a motion by the BOP, a sentencing court had no jurisdiction to modify an inmate's sentence. Congress did not define what constitutes an "extraordinary and compelling reason," but the legislative history recognized that the statute was intended, in part, to abolish and replace federal parole. Rather than have the parole board review for rehabilitation only, Congress authorized review for changed circumstances:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term on imprisonment. S. Rep. No. 98-225 at 55-56 (1983).

18 U.S.C. § 3582 acts as a "safety valve" for the "modification of sentences" that would previously have been addressed through the former parole system. *Id.* at

121. The provision was intended "to assure the availability of specific review and reduction of a term of imprisonment for "extraordinary and compelling reasons" and [would allow courts] to respond to changes in the guidelines." *Id.* Thus, sentencing courts have the power to modify sentences for extraordinary and compelling reasons.

### 2.      Section 3582(c)(1)(A) is Not Limited To Medical, Elderly or Childcare Circumstances

Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the United States Sentencing Commission. 28 U.S.C. § 994(t) ("The Commission...shall describe what should be considered "extraordinary and compelling reasons" for sentence reduction, including the criteria to be applied and a list of specific examples." Congress provided one limitation to that authority: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Rehabilitation could, however, be considered with other reasons to justify a reduction.

Pursuant to section 994(p) of title 28, United States Code, the United States Sentencing Commission hereby submits to the Congress the following amendments to the Guidelines Manual and the reasons therefor. As authorized by such section, the Commission specifies an effective date of November 1, 2023, for these amendments:

(b)      *Extraordinary and Compelling Reasons.*– Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:

20

(1) *Medical Circumstance of the Defendant.–*

    (A)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.

    (B)    The defendant is—

        (i)    suffering from a serious physical or medical condition,

        (ii)    suffering from a serious functional or cognitive impairment, or

        (iii)    experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

    (C)    The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

    (D)    The defendant presents the following circumstances—

        (i)    the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

        (ii)    due to personal health risk factors and custodial status, the defendant is at increased

21

risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

(iii)   such risk cannot be adequately mitigated in a timely manner.

(2)   *Age of the Defendant.*— The defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(3)   *Family Circumstances of the Defendant.*—

(A)   The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.

(B)   The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(C)   The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.

(D)   The defendant establishes that circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family member or an individual whose relationship with the defendant is similar in kind to that of an immediate family member, when the defendant would be the only available caregiver for such family member or

individual. For purposes of this provision, 'immediate family member' refers to any of the individuals listed in paragraphs (3)(A) through (3)(C) as well as a grandchild, grandparent, or sibling of the defendant.

(4) *Victim of Abuse.*— The defendant, while in custody serving the term of imprisonment sought to be reduced, was a victim of:

    (A) sexual abuse involving a 'sexual act,' as defined in 18 U.S.C. § 2246(2) (including the conduct described in 18 U.S.C. § 2246(2)(D) regardless of the age of the victim); or

    (B) physical abuse resulting in 'serious bodily injury,' as defined in the Commentary to §1B1.1 (Application Instructions); that was committed by, or at the direction of, a correctional officer, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant. For purposes of this provision, the misconduct must be established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger.

(5) *Other Reasons.*— The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

(6) *Unusually Long Sentence.*— If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than

an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

This amendment responds to, among other things, the First Step Act of 2018 ("First Step Act"), Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239, which amended 18 U.S.C. § 3582(c)(1)(A) to authorize courts to grant a motion for a sentence reduction upon a defendant's own motion. Previously, a court was authorized to do so only upon the motion of the Director of the Bureau of Prisons ("BOP"). Congress amended the law for the express purpose, set forth on the face of the enactment, of "increasing the use" of sentence reduction motions under section 3582(c)(1)(A). First Step Act § 603(b).

3.     The First Step Act

The First Step Act, P.L. 115-391, 132 Stat. 5194, at (Dec. 21, 2018), among other things, transformed the process for compassionate release. *Id.* at § 603. Now, instead of depending upon the BOP to determine an inmate's eligibility for extraordinary and compelling reasons and the filing of a motion by the BOP, a court can resentence "upon motion of the defendant." A defendant can file an appropriate

24

motion if the he or she has exhausted all administrative remedies or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The purpose and effect of this provision is to give federal courts the ability to hear and resentence a defendant even in the absence of a BOP motion. Congress labeled this change "Increasing the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018). Senator Cardin noted in the record that the bill "expands compassionate release under the Second Chance Act and expedites compassionate release applications." 164 Cong. R. 199 at S7774 (Dec. 18, 2018). In the House, Representative Nadler noted that the First Step Act includes "a number of very positive changes, such as … improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 Cong. R. H10346-04 (Dec. 20, 2018).

Once an inmate has pursued administrative remedies through the BOP, upon his or her motion, the sentencing court has jurisdiction and the authority to reduce a sentence if it finds "extraordinary and compelling reasons" to warrant a reduction. Judicial authority is no longer limited to cases that have the approval of the BOP.

### 4.    Neal Has Exhausted Administrative Remedies

A motion by an inmate can be filed in the district court after (1) the inmate has made the request to the Warden, and (2) either the request was denied or 30 days have lapsed from the receipt of the request, whichever is sooner. First Step Act of 2018, section 803(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).

On March 21, 2025, Dr. L. Pujol, Psy.D., reviewed Mr. Neal's eligibility for early release and denied it, citing the absence of any recorded changes or amendments that would affect his sentence or conviction. See Exhibit 1. On March 25, 2025, Mr. Neal submitted an Administrative Remedy to the Warden at FCI Terminal Island, asserting that the dismissal of Counts 4s and 5s of the Superseding Indictment should render him eligible for an early release. *Id.*

On May 16, 2025, the BOP Executive Staff responded, indicating that Neal's counselor would follow up regarding the status of his request. *Id.* Subsequently, on May 30, 2025, Acting Warden R. Caternolo issued a formal response, again denying the request and reiterating that no amendments to Neal's sentence or conviction were reflected in the record. *Id.*

On June 10, 2025, Neal appealed the denial, emphasizing that Counts 4s and 5s of the Superseding Indictment were dismissed on April 10, 2013, as documented in the court record [Doc. 253]. As of the date of this filing, Neal has not received any

26

response to his appeal. Because 30 days have passed and the BOP failed to file a motion on Neal's behalf, exhaustion of administrative remedies is not an issue in this case. See 18 U.S.C. § 3582(c)(1)(A).

**B.** **The Changes in Relevant Law, along with Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct, Are Extraordinary and Compelling Circumstances That Warrant Release.**

Section 3582(c) states that a district court cannot modify a term of imprisonment once it has been imposed except that, in any case:

> The court, upon motion of the Director of the Bureau of Prisons, or the defendant, pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> > (i)    extraordinary and compelling reasons warrant such a reduction.

18 U.S.C. § 3582(c)(1)(A).

In this case, there are at least three extraordinary and compelling reasons warranting such a reduction, discussed as follows:

> 1.    First Step Act—Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A)

This responds to the First Step Act of 2018, Pub. L. 115–391 (Dec. 21, 2018)

27

("First Step Act" or "Act"), which contains numerous provisions related to sentencing, prison programming, recidivism reduction efforts, and reentry procedures. Specifically, the sentencing reform provisions of the Act (1) amended the sentencing modification procedures set forth in 18 U.S.C. § 3582(c)(1)(A) to allow a defendant to file a motion seeking a reduction in the defendant's term of imprisonment under certain circumstances; (2) reduced certain enhanced penalties imposed pursuant to 21 U.S.C. § 851 for some repeat offenders and changed the prior offenses that qualify for such enhanced penalties; (3) broadened the eligibility criteria of the "safety valve" provision at 18 U.S.C. § 3553(f); (4) limited the "stacking" of certain mandatory minimum penalties imposed under 18 U.S.C. § 924(c) for multiple offenses that involve using, carrying, possessing, brandishing, or discharging a firearm in furtherance of a crime of violence or drug trafficking offense; and (5) allowed for retroactive application of the Fair Sentencing Act of 2010. Revisions to the Guidelines Manual may be appropriate to implement the Act's changes to 18 U.S.C. § 3582(c)(1)(A).

The 814 Amendment had also revised the list of "extraordinary and compelling reasons" in §1B1.13 in several ways. The sixth amendment added a new category ("Unusually Long Sentences") providing that if a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change

in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances. See USSG §1B1.13 (b)(6).

### *Neal Received An Unusually Long Sentence*

In this case, Neal has already served over a decade– a substantial portion of his sentence, which has taken a significant toll physically, mentally, and emotionally. It is essential to note that Neal's Counts 4s and 5s of the Superseding Indictment was ordered to be dismissed on April 10, 2013 [Doc. 253], faced an unusually severe sentence that is both disproportionate and unjustifiable. The imposition of such an extraordinary punishment on an individual with dismissed charges undermine the principles of fairness and proportionality that should guide sentencing decisions. This further highlights the need for a reconsideration and reduction of his sentence to ensure justice is served. Extended incarceration often leads to isolation from family and community, diminishing the inmate's chances of successful reintegration. By serving such an unusually long sentence, Neal has endured the full punitive intent of the unjustifiable sentence and has faced conditions that inherently come with time

served in prison, including limited autonomy, social and psychological impact of prolonged confinement.

In light of the principles of compassionate release, Neal's unusually long sentence is unjustifiable despite the dismissal of the charges, the BOP continues to list Counts 4s and 5s as active convictions in Neal's record. This erroneous information has materially impacted his classification, custody status, programming eligibility, and possibly sentence computation. In fact, Neal has attempted to resolve this discrepancy administratively with the BOP, but to date, the records remain uncorrected, and the BOP has stated that they have no record of any dismissal. This misrecording may be causing Neal to serve more time than the Court intended, or to be denied access to programs, early release mechanisms, or placement options for which he would otherwise be eligible. Here, the continued inclusion of dismissed charges in BOP's records is both factually inaccurate and legally unjust, as it undermines the express terms of this Court's order. This ongoing error creates an extraordinary and compelling circumstance warranting judicial intervention, particularly when the record of dismissal is unambiguous and the BOP has failed to correct the error.

Under the 814 Amendment, this is considered to be an unusually long and harsh sentence. Thus, this presents as an "extraordinary and compelling reasons." See

30

*United States v. Salliey*, CRIMINAL ACTION RDB-10-0298 (D. Md. Feb. 13, 2023),

the Court concludes that the length of Salliey's sentence, the substantial time he has

already served, and his strong evidence of rehabilitation are collectively sufficient.

Salliey was sentenced to a term of 204 months, or seventeen years, for possession of

a firearm. (See Judgment 2.) The record reflects that he has already served a

substantial portion of that sentence, and that he is scheduled to be released in just

over two years.

2.    Unwarranted Sentence Disparities Among Defendants
With Similar Records Who Have Been Found Guilty of
Similar Conduct

With respect to the need to avoid unwarranted sentencing disparities, Neal

urges the Court to consider the *Redd* cases:

- *United States v. Clark*, Case No. 11-CR-30-2-JPS (E.D. Wis. Jul. 23, 2020) quoting that in *Redd*, the Court evaluated whether extraordinary and compelling reasons existed to reduce the sentence by considering (1) the sentence the defendant originally received compared to the one he would receive today; (2) the disparity between those sentences; and (3) the reason for that disparity. *Redd*, 2020 WL 1248493, at *5. There, the court determined that the disparity was "primarily the result of Congress' conclusion that sentences like [defendant's] are unfair and unnecessary." *Id.* at *6.

- *United States v. Brooks*, Case No. 07-cr-20047-JES-DGB (C.D. Ill. May. 15, 2020) quoting that in *Redd*, the district court held "a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. §

1B1.13 cmt. n.1(A)-(C) and that the reasons it has determined in this case constitute extraordinary and compelling reasons warranting a sentence reduction satisfy any requirement for consistency with any applicable policy statement."

Neal is now, in effect, to be re-sentenced today, after the passage of the First Step Act; and the need to avoid unwarranted sentencing disparities is to be assessed at the time of his sentencing today relative to those comparable offenders who have been sentenced following the passage of the First Step Act and grants of compassionate releases based on the need to avoid unwarranted sentencing disparities, which expressly allowed for the possibility for a sentence reduction based on an individualized assessment of the § 3553(a) factors and other criteria.

Neal essentially argues that the unwarranted sentencing disparity factor must be determined only with reference to those comparably situated defendants– those being sentenced today under a different sentencing structure and/or received a reduction in sentence based on the need to avoid unwarranted sentencing disparities. Neal's sentence in 2011 is now disparate relative to Defendant's who were sentenced after December 21, 2018.

See e.g., *United States v. Vazquez-Rivera*, 470 F.3d 443, 449 (1st Cir. 2006) (recognizing that "a district court may consider disparities among co-defendants in determining a sentence"); *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006)

("Although § 3553(a) does not require district courts to consider sentencing disparity among co-defendants, it also does not prohibit them from doing so."); *United States v. Gomez*, 215 F. App'x 200, 202 (4th Cir. 2007) (implying that consideration of co-defendant disparities is allowed, but concluding that Gomez was not similarly situated to the co-defendant); *United States v. Bennett*, 664 F.3d 997, 1015 (5th Cir. 2011) ("[A]voiding unwarranted sentencing disparities among co-defendants is a valid sentencing consideration."), cert. denied, 11-9109, 2012 WL 733887 (Apr. 2, 2012); *United States v. Simmons*, 501 F.3d 620, 624 (6th Cir. 2007) ("A district judge, however, may exercise his or her discretion and determine a defendant's sentence in light of a co-defendant's sentence."); *United States v. Pulley*, 601 F.3d 660, 668 (7th Cir. 2010) ("Pulley properly contends that § 3553(a)(6) does not allow unwarranted sentencing disparities between co-defendants." (citing *Statham*, 581 F.3d at 556; *Bartlett*, 567 F.3d at 908–09)); *United States v. Lazenby*, 439 F.3d 928, 933 (8th Cir. 2006) (invalidating a sentence that resulted in unwarranted disparities between the sentences of the defendant and less culpable members of related conspiracies); *United States v. Saeteurn*, 504 F.3d 1175, 1181–83 (9th Cir. 2007) (upholding as a legitimate generalized § 3553(a) consideration the district court's decision to compare defendant with his co-defendants and sentence him in accordance with his role); *United States v. Smart*, 518 F.3d 800, 804 (10th Cir. 2008) ("[A] district court may also properly

account for unwarranted disparities between codefendants who are similarly situated, and...the district court may compare defendants when deciding a sentence."); *United States v. Zavala*, 300 F. App'x 792, 795 (11ᵗʰ Cir. 2008) ("It is not erroneous for the district court to have considered the 'unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct' when the statute specifically mandates such consideration."); *United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (considering and rejecting an argument that a disparity between co-defendants' sentences was unwarranted), cert. denied, 131 S. Ct. 586 (2010).

Under 18 U.S.C. § 3582(c)(2), to modify Neal's sentence, taking into account the advisory nature of the guidelines after *Brooker* and the considerations set forth in 18 U.S.C. § 3553(a). Thus, Neal respectfully requests that this Court to confirm and clarify in a supplemental order that Counts 4s and 5s of the Superseding Indictment were dismissed in accordance with the Court's original judgment; direct the BOP to correct its records to reflect this dismissal; reduce Neal's sentence under 18 U.S.C. § 3582(c)(1)(A) as appropriate, in light of the continuing prejudice suffered as a result of this error; and in the alternative, hold a hearing to determine whether relief is appropriate under the circumstances.

Accordingly, this motion must be granted.

34

## IV. CONCLUSION

For the above and foregoing reasons, Neal prays this Court would consider his

Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First

Step Act of 2018, based upon the "extraordinary and compelling reasons" and release

him to home confinement or hold a hearing as soon as possible.

Respectfully submitted,

Dated: July 21, 2025

BYRON NEAL
REG. NO. 30456-034
FCI TERMINAL ISLAND
FEDERAL CORR. INSTITUTION
PO BOX 3007
SAN PEDRO, CA 90733
Appearing *Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2025, a true and correct copy of the above and foregoing Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018 was sent via U. S. Mail, postage prepaid, Carter Kenneth Derrick Guice, Jr., Assistant U.S. Attorney at U. S. Attorney's Office (New Orleans), 650 Poydras St., Suite 1600, New Orleans, LA 70130.

BYRON NEAL

35